WASHINGTON (MANDEVILLE v.). See Case No. 9,017.

WASHINGTON, The (MARINERS v.). See Case No. 9,086.

WASHINGTON (OWNER v.). See Case No. 10,635.

WASHINGTON (PANCOST v.). See Case No. 10,706.

WASHINGTON (PATTEN v.). See Case No. 10,813.

WASHINGTON, The (POOLE v.). See Case No. 11,271.

———

## Case No. 17,232.

### The WASHINGTON v. The SALUDA.

[3 U. S. Law Int. 249.]

District Court, D. South Carolina. April 27, 1831.

PILOTS IN CHARLESTON HARBOR—KNOWLEDGE OF DANGERS IN CROSSING BAR—RIGHT TO SALVAGE.

[1. It is the duty of pilots for the port of Charleston, S. C., to be thoroughly acquainted with the bar at the mouth of the harbor, and all its difficulties and dangers. It would seem that, from experience and information. they should be able to judge, from the state of the wind and weather, whether it is practicable, at a given time, to cross the bar with a vessel of given draught, and whether there would probably be danger of thumping on account of swells.]

[2. A pilot who is part owner of a pilot boat should not be allowed, on the ground of public policy, to recover salvage for towing in a vessel which received an injury by thumping on the bar while going out of the harbor under his charge as a pilot.]

[This was a libel by the owners of the pilot boat Washington against the ship Saluda to recover salvage.]

Petigru & Cruger, for libellants.

Legare & Egleston, for respondent.

BY THE COURT. The libellants in this case claim a compensation, by way of salvage, for towing into port the packet ship Saluda, which was prevented from prosecuting her voyage by injuries which she suffered by frequently striking on the bar in crossing it. The case is novel, extraordinary, and without precedent in this court. On the 25th ult. one of the libellants, a branch pilot, and part owner of the pilot boat Washington, took charge of the Saluda, for the purpose of piloting her to sea. The following witnesses, all pilots of this port, were examined for the libellants, viz.: Mr. Mullins, Mr. Albrit, Mr. Delaney, and Mr. Lee. They proved that the pilot, James Copes, one of the libellants, attempted to cross the bar, in the Saluda, after about three hours and a half flood. They further deposed that there was usually on the bar, at high water, about 16½ and 17 feet. The ship Saluda drew 11 or 11½ feet water, and they concurred in the opinion that when she was carried out there was water enough, if it had not been for the great swell, of which they could have no knowledge until they were on the bar. It did not appear from any of the testimony what proportion of the 6 feet which the tide usually rises, was on the bar at 3½ hours flood, when the Saluda crossed. The probability is that at the time of her crossing there were about 14 or 14½ feet water. A minute detail of the evidence is not deemed necessary.

The following points were established: That vessels very frequently struck on the bar in going out; one of the witnesses thought that at least 6 out of 8 thumped in crossing the bar. 2d, that the bar at high water usually had 16½ or 17 feet. 3d, that, when the Saluda crossed, there was water enough to carry her over safely, if it had not been for a swell on the bar. 4th, that the pilots had been frequently compensated in similar cases, in some as far as $500. And, lastly, that they had never known a vessel of the draught of water of the Saluda, to strike on crossing the bar at high water.

The court will consider and decide this case on the grounds of law, justice, and policy, arising from the positions and facts just stated. The witnesses all testified that it was a common thing for vessels to thump on the bar in going out. The cases which occurred on that day go very far to verify their assertion. The brig Wilson, drawing about 12 feet water, struck in going out, lost her rudder, and was brought back for repair. The Robert Morris, which crossed the bar about three-quarters of an hour before the Saluda, also struck. It seems reasonable to inquire why these three vessels, the Wilson, the Robert Morris, and the Saluda, with no greater draught of water than 11 or 12 feet, should have struck on a bar, which at high tide usually had upon it 16½ or 17 feet water. What was the answer given by the witnesses to this natural inquiry? Why, that there was a heavy sea running on the bar, and

that, on the occasional subsidence of the swell, the depth of water became two or three feet less. The court is quite willing to believe that such is the fact, but will it, ought it, to exculpate the pilot in case of accident? What are the duties of a pilot, and what is the knowledge which he ought to possess to qualify him for the faithful performance of that duty? I cannot be mistaken in saying that he should be intimately acquainted with the channels, with the bar, and all its difficulties and dangers. The trust confided to him is a high and responsible one, involving the lives and property of the citizens, and demanding all his care, caution, and vigilance. The witnesses say that they could not know of the swell on the bar until they were upon it. The court would ask whether the past experience of a pilot ought not to give him the information (arising from the state of the wind and weather) of the condition of the bar, and the practicability of crossing it with safety; or whether, being doubtful on this head, he ought not either to have sent his pilot boat ahead to reconnoitre the ground, or waited until high water, when the witnesses all agree that no accident could have happened. I see nothing impossible in such a proceeding; nay, it seems to me to have been the course which prudence and duty called for. The court cannot conclude the remarks on this head without observing that to the injuries which may be sustained from this cause of heavily laden vessels thumping on the bar in going out, perhaps on a long voyage, may be attributed their frequent loss at sea.

Another fact established by the libellants' own witnesses, which has just been adverted to, seems to settle this question. They all swear that they never knew a vessel of the Saluda's draught strike on the bar at high water. With this knowledge, which all the pilots possessed, why attempt to cross the bar before high water, when it is in evidence that by doing so six out of eight vessels thump (in their language) on the bar, and frequently have to return for repair, to the great delay and injury of commerce?

It is universally known that, when the pilot is in possession of the ship, he has the absolute and undisputed command of her. The destiny of the ship is in his hands, and he is bound to exercise that authority with the judgment and skill which belong to that important station. He is answerable, and ought to be so, for the safety of the ship in all ordinary circumstances; like common carriers, he can only be relieved, in case of damage or loss, by showing that the causes producing it were beyond his control, arising from the act of God, or a vis major of the elements. Can this claim then be supported by justice? My previous reasoning has sufficiently answered this question. A word or two, in conclusion, as to the policy which ought to govern this case. Suppose such claims were countenanced in this court, what would be the probable consequences which would follow? Evidently a serious interruption to commerce, and a strong temptation to pilots to perform

their duty negligently. It would be holding out a reward to them to do so. Would not their interest be materially affected by such a practice in this court? Most assuredly. Instead of their pilotage. which is intended as a compensation for skill, experience. and fidelity, they would not only receive that, but, as one of the witnesses swore, $400 or $500 for their errors or negligence. I mean to impute no improper motives to the pilots of Charleston, but I consider myself bound, from a sense of duty, to say that they ought not to be so tempted. This court will hold out no such temptation.

The court has been told, by way of inducement, that usage has sanctioned such claims; that arbitrators have frequently awarded compensation in cases like the present. Such decisions have no authority here. If it is a usage, it ought to be abolished,—"malus usus," &c. On the grounds, therefore, of law, justice, and policy, this libel must be dismissed, with costs.